Charles B. WORLAND, Appellant,

v.

Jacqueline K. WORLAND, Appellee.

No. S–13498.

Supreme Court of Alaska.

Oct. 1, 2010.

Herbert A. Viergutz, Law Office of Herbert A. Viergutz, Anchorage, for Appellant.

Timothy P. Peters, Law Office of Timothy P. Peters, LLC, Anchorage, for Appellee.

Before: FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

Charles and Jacqueline Worland separated in 2005 at the initiation of divorce proceedings. They attended a settlement conference in 2006 and agreed to a division of their marital property. The superior court enforced the parties' settlement agreement over Charles's objection and issued its divorce decree, orders, and findings of fact and conclusions of law. We later affirmed the

superior court's judgment.[1] After we issued our decision the superior court granted Jacqueline's request for a clerk's deed, modified its orders concerning Charles's military pension, sanctioned Charles, and awarded Jacqueline attorney's fees. Charles appeals. We vacate the imposition of sanctions, vacate the amended divorce decree and remand for corrections, and affirm the remainder of the superior court's orders.

## II. FACTS AND PROCEEDINGS

Charles and Jacqueline Worland married on March 20, 1982, and separated on February 17, 2005, the day Jacqueline filed this divorce action. They attended a settlement conference in February 2006. The parties agreed and placed on the record that: (1) Charles would assume or refinance the mortgage on their house and Jacqueline would receive 60% of the equity; (2) Charles and Jacqueline would equally divide their pensions, including Charles's military pension; and (3) Charles would pay Jacqueline $2,000 in attorney's fees.

In July 2006 Jacqueline requested a hearing to resolve issues pertaining to the pension orders, the amount Charles was to pay Jacqueline for her share of the house equity, and the final divorce decree. The hearing took place in October and was continued into November. Both parties were represented by attorneys who entered appearances after the settlement conference. The following month Charles filed paperwork arguing that no settlement existed and that the superior court should order a trial.

In May 2007 the superior court rejected Charles's argument and issued its divorce decree, orders, and amended findings of fact and conclusions of law. The military pension order submitted by Jacqueline and signed by the court provided that Charles had served 248 months after the marriage and assigned Jacqueline "[f]ifty [p]ercent (50%) of the marital portion of [Charles's] total disposable military retirement pay." The court divided the other pensions equally and ordered Charles to "refinance the marital home and pay [Jacqueline] 60% of [the] equity within 45–days." The court later awarded $14,790.20 in attorney's fees to Jacqueline.

Charles appealed, and we affirmed the superior court's judgment in September 2008.[2] We rejected Charles's argument that the court erred by enforcing the settlement agreement.[3] We determined the court did not err in dividing the marital property.[4] Finally, we upheld the court's award of attorney's fees.[5]

In October 2008 Jacqueline moved to enforce the superior court's orders. She asserted that Charles had failed to (1) pay the attorney's fees awarded to her and (2) remove her name from the house mortgage and pay her 60% of the house equity, which she calculated to be $57,065.33. Jacqueline requested that the superior court "issu[e] a clerk's deed awarding all interest in the marital home to [her]" at which point she "could ... sell the home and obtain the majority of the proceeds owed to her." Charles opposed the motion and asked the superior court to order Jacqueline to make the mortgage payments going back to February 28, 2006, because she had continued to reside in the home.

The superior court granted Jacqueline's motion in late February 2009. The court specified that the clerk's deed would provide Jacqueline the "power of sale of the marital home" and would "substitute for $69,580.00 of the amount [Charles] owes to [Jacqueline]." The court also ordered Charles to satisfy his remaining debt to Jacqueline on or before April 1.

In March Jacqueline moved to correct the final value of the house equity and for more than $30,000 in attorney's fees.[6] She also asked the court to amend the military pen-

---

1. *Worland v. Worland,* 193 P.3d 735, 743 (Alaska 2008).

2. *Id.* at 738, 743.

3. *Id.* at 739–41.

4. *Id.* at 741.

5. *Id.* at 741–43.

6. According to Jacqueline's motion, "the equity in the home after sale ... will likely only yield about $60,000 rather than ... $69,580."

sion order and to award her the entire pension because (1) she was owed money for the previously unpaid share of the pension [7] and (2) Charles "dropped [her] from the survivor benefit status, in complete disregard of the injunction preventing him from doing so." In response, Charles moved for attorney's fees and sanctions.

On March 20 Charles apparently wrote a personal check to Jacqueline for $77,659.87 but did not deliver it,[8] later claiming this satisfied his debt to her. One week later Charles filed an expedited motion to vacate the clerk's deed. Charles indicated he did not deliver the check because he was waiting to exchange it for a quit claim deed to the house.

The superior court denied Charles's expedited motion on April 9. The court also denied Jacqueline's motion to correct the final value of the house equity. With respect to the military pension order, the court "granted in principle" Jacqueline's request "to correct for the arrears that have built up because of [Charles's] appeal and other delay" (emphasis omitted) and ordered Jacqueline to introduce evidence showing the amount of arrears. The court also modified its prior order by requiring Charles, "as a sanction for his removing [Jacqueline's] name" from the survivor benefits plan, "to immediately obtain at his sole expense and maintain at his sole expense survivor benefits for [Jacqueline]." (Emphasis omitted.) The court denied Charles's motion for attorney's fees and sanctions.

Charles moved in our court for a stay of the clerk's deed. An individual justice stayed the deed's issuance until May 20 and ordered that by that deadline:

Charles Worland shall tender to Jacqueline Worland or her attorney a cashier's check in the amount of $74,995.60, which amount represents the 60% of equity in the home and the ordered attorney's fees and interest through October 17, 2008. If this cashier's check is not tendered by the deadline, the stay will dissolve without further order of this court. If the cashier's check is tendered by the deadline, the stay will continue through the pendency of the appeal.

Charles delivered a cashier's check to Jacqueline's attorney on May 20 for the required amount. Although Jacqueline acted on the clerk's deed to refinance the house sometime between the superior court's denial of Charles's expedited motion to vacate the clerk's deed and the individual justice's grant of the motion to stay, Jacqueline states she "has not used the [d]eed following the [individual justice's] order and intends to wait and comply with whatever further order follows."

Responding to the superior court's April 9 order, Jacqueline claimed the amount of arrears for the military pension was $33,491.96. She also contended that the court's prior military pension order misstated the total number of months Charles served in the military, and as a result she was to receive less than half of Charles's military pension. Jacqueline asked the court to issue an amended divorce decree accounting for the correct number of months Charles served in the military. Jacqueline also requested that the court issue its final order regarding attorney's fees.

In July the court entered an amended divorce decree assigning Jacqueline 50% of Charles's "total gross military retirement pay." The court issued a separate order with respect to the military pension arrears, requiring Charles to pay Jacqueline $33,491.96 "to accommodate a 50/50 division of [the] military pension." The court also awarded Jacqueline $15,000 for attorney's

---

7. In response to Jacqueline's prior inquiry, the Defense Finance and Accounting Service (DFAS) had explained that it could not pay her share of the pension retroactive to the February 2006 implementation date because the court had not issued a final order. (In this context, a final order is "a decree from which no appeal may be taken." 10 U.S.C. § 1408(a)(2)-(3).) To correct for the arrears accrued after the implementation date, as well as to effectuate the terms of the

settlement agreement, Jacqueline asked the court to amend the military pension order and either add the amount of arrears to Charles's total outstanding debt or award a large percentage of the pension to Jacqueline in the order.

8. This amount appears to have been intended to pay 60% of the house equity, interest, and attorney's fees.

fees incurred post-judgment. It denied Charles's motion for attorney's fees.

Charles appeals.

## III. STANDARD OF REVIEW

■ We review the equitable allocation of property for abuse of discretion and will not reverse a superior court's allocation "unless it is clearly unjust." [9] However to the extent a court makes a legal determination in deciding what property is available for distribution, we review that determination under the independent judgment standard.[10] "Whether ... [apportionment] of a military pension is consistent with federal law is a question of law we review de novo." [11] We review findings of fact for clear error.[12] We will uphold an award of attorney's fees absent abuse of discretion.[13] We will conclude a superior court abused its discretion "if, after reviewing the whole record, we are left with a definite and firm conviction that the superior court erred in its ruling." [14]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Denying Charles's Motion To Vacate The Clerk's Deed.

■ Charles argues it was error for the superior court to deny his motion to vacate the clerk's deed. He claims the court should have granted his motion because "he in all respects was prepared to and did tender a check for the agreed upon amount to [Jacqueline] pursuant to [the] [c]ourt [o]rder." We disagree.

During the 2006 settlement conference the parties agreed that Charles would assume or refinance the house mortgage and Jacqueline would receive 60% of the house equity. We held in September 2008 that the court did not err by enforcing that settlement agreement.[15] By February 2009 Charles still had not removed Jacqueline's name from the mortgage nor paid her for her share of the equity. Given this unjustified delay, the court did not err either by granting the motion requesting entry of a clerk's deed or by denying Charles's motion to vacate the deed.

The record does not support Charles's claim that "he in all respects was prepared to and did tender a check for the agreed upon amount to [Jacqueline] pursuant to [the] [c]ourt [o]rder." Charles is mistaken that the court's order allowed him to avoid issuance of the clerk's deed through payment. The court granted the request for entry of a clerk's deed to "substitute for $69,580.00 of the amount [Charles] owes to [Jacqueline]." That amount represented payment toward Jacqueline's share of the equity in the house. The court also ordered Charles to pay Jacqueline directly for the remaining debt.[16]

Although the record shows that Charles wrote a check to Jacqueline, the record does not support his assertion that Jacqueline rejected an attempt to pay her. The only evidence supporting Charles's claim is his attorney's affidavit, stating that (1) Charles tendered the check and was "prepared to hand [it] over" and (2) "neither [Jacqueline's] counsel nor [Jacqueline] ha[s] arrived at the offices of the undersigned to exchange the check for the [q]uit [c]laim [d]eed." But the attorney does not state that Jacqueline or her attorney were aware of or refused to

9. *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (quoting *Cox v. Cox*, 882 P.2d 909, 914 (Alaska 1994)).

10. *Cox*, 882 P.2d at 913 (citing *Lewis v. Lewis*, 785 P.2d 550, 552 (Alaska 1990)).

11. *Young v. Lowery*, 221 P.3d 1006, 1010 (Alaska 2009) (citing *Clauson v. Clauson*, 831 P.2d 1257, 1261–62 (Alaska 1992)).

12. *Inman v. Inman*, 67 P.3d 655, 658 (Alaska 2003) (quoting *Am. Computer Inst., Inc. v. State*, 995 P.2d 647, 651 (Alaska 2000)).

13. *See Carr v. Carr*, 152 P.3d 450, 457 (Alaska 2007) (reviewing attorney's fees award for abuse of discretion).

14. *Beal v. McGuire*, 216 P.3d 1154, 1162 (Alaska 2009) (citing *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000)).

15. *Worland*, 193 P.3d at 739–41.

16. The remaining debt included "all remaining equity payments, attorney fees and costs that are due and owing after applying the ... $69,580.00 credit for the [c]lerk['']s [d]eed."

accept a delivered check.[17] Additionally, as Jacqueline noted, a personal check is not payment but merely a promise to pay.[18] Given that Charles had promised to make this payment more than two years earlier but had not done so, the court was not obliged to accept Charles's assertion that he would now follow through on a new promise.

Because our review of the record does not reveal "a definite and firm conviction that the superior court erred in its ruling," [19] we conclude the court did not abuse its discretion by denying the motion to vacate the clerk's deed.[20]

### B. The Superior Court Did Not Err By Awarding Jacqueline $33,491.96 To Compensate For Her Unpaid Share Of The Military Pension.

■ Jacqueline did not receive her share of Charles's military pension from February 2006 through December 2008. The superior court awarded Jacqueline $33,491.96 "to compensate . . . for her 50% portion of the pension that she was entitled to." Charles argues it was error to make the award because Jacqueline "was not entitled to receive military retirement benefits until the [a]ppeal had been concluded by its [f]inal [o]rder pursuant to law."

Charles is correct that a former spouse cannot receive payments directly from DFAS until the superior court issues a final court order.[21] In this context a "final court order" is statutorily defined in part as "a decree from which no appeal may be taken." [22] Because the court's order awarding Jacqueline 50% of the pension was not a final order

within the meaning of the statute—the award was timely appealed—she was unable to collect that award directly from DFAS.

However, as DFAS explained to Jacqueline, she still was able to collect payment for the military pension arrears directly from Charles.[23] Jacqueline expressly requested the alternative that Charles pay her directly. When granting Jacqueline's motion, the court made clear that the award was to be collected directly from Charles, not DFAS: "This Court . . . hereby orders [Charles] to pay [Jacqueline] the sum of $33,491.96. . . ." (Emphasis omitted.) Therefore it was not error for the court to make the award.

### C. It Was Not Error For The Superior Court To Attempt To Correct The Military Pension Order To Describe The Marital Share, But It Was Error To Do So By Dividing Charles's Total Pension Pay Through The Amended Divorce Decree.

■ Charles claims it was error for the court to issue its amended divorce decree because the decree "provid[ed] that [Jacqueline] was entitled to 50% of the total gross military retirement pay of [Charles], even though that retirement pay was not earned during the course of the marriage."

We first note that, based on the terms of the settlement and the superior court's findings, Jacqueline was entitled to half of Charles's military pension—not half of the marital portion of that pension. But even assuming Jacqueline was entitled only to a marital share of the military pension,[24] Charles's argument is still without merit. The record indicates that Charles earned his

---

**17.** In an affidavit filed in our court on May 1, 2009, Jacqueline's attorney stated that he had "never seen the actual check . . . other than by photocopy attachment to pleadings filed by [Charles]" and had "never been able to successfully secure either the personal check or a substitute Cashier's Check as a preferred form of payment."

**18.** 11 Am.Jur.2d *Bills and Notes* § 31 (2010).

**19.** *Beal,* 216 P.3d at 1162.

**20.** The record is unclear as to how Charles's equity in the house has been 'or will be resolved given the circumstances. On remand the superi-

or court should ensure that both parties' equity in the house is protected.

**21.** 10 U.S.C. § 1408.

**22.** *Id.* at (a)(2)-(3).

**23.** Brett R. Turner, Equitable Distribution of Property § 6:4, at 34 (3d ed.2005) (noting that although "[t]he federal government will not make payments directly to a former spouse to pay off arrears in previously due payments," they "can be recovered . . . directly from the service member").

**24.** In the original military pension order the superior court assigned Jacqueline 50% of the mar-

pension entirely during the marriage. The amended divorce decree was issued to amend the military pension order to correct the number of months that Charles served in the military after the marriage—from 248 to 256—so that Jacqueline would receive half of the pension from the DFAS.[25] Because Charles has not pointed to any evidence in the record demonstrating that he earned any part of his pension while he was not married to Jacqueline, we reject Charles's argument.

We do agree with Charles that it was error to assign Jacqueline half of Charles's "total gross military retirement pay" in the amended divorce decree. As we explained in *Young v. Lowery,* "a court may not equitably divide total retired pay; it may equitably divide only the amount of retired pay remaining after the court deducts waived retired pay and the cost of purchasing survivor benefits."[26] To the extent the superior court was using this mechanism to effectuate its sanction order requiring Charles to pay all of the survivor benefits cost, our decision vacating that sanction, discussed next, eliminates the need to determine whether the superior court's order was permissible for that purpose.

On remand, the court should correct the amended divorce decree and the military pension order to properly allocate Charles's "disposable retirement pay" as defined in 10 U.S.C. § 1408(a)(4).

### D. We Vacate The Superior Court's Sanction Against Charles.

The superior court initially assigned Jacqueline half of Charles's "total disposable military retirement pay." The court modified its military pension order by requiring Charles, "as a sanction for his removing [Jacqueline's] name" from the survivor benefits plan, "to immediately obtain at his sole expense and maintain at his sole expense survivor benefits for [Jacqueline]." (Emphasis omitted.) Charles contends the superior court erroneously sanctioned him. Without addressing the merits of the dispute, we agree with Charles that the sanction must be vacated.

■■■ "Alaska's trial courts may insure proper efficiency and discipline by exercise of (1) the power of contempt authorized by statute and court rule, (2) the power to impose fines as sanctions authorized by court rule, or (3) the inherent power to punish for contempt."[27] But because the superior court identified neither the nature of the sanction nor a rule on which it relied, we lack a sufficient basis to review the sanction and we therefore vacate it.[28] In the interest of judicial economy, we will nonetheless consider possible bases to impose sanctions to guide the superior court on remand.

■■■ Civil Rules 70 and 90 provide that the court may hold a party in contempt,[29] and we have held that superior courts are inherently authorized to punish for contempt.[30] The superior court might have held Charles in contempt for not complying with its order concerning Jacqueline's rights under the survivor benefits plan.[31] If so, this contempt was likely criminal, not

---

ital portion of Charles's total disposable military retirement.

**25.** Based on this error in the original order Jacqueline would have received 48.4375% rather than 50% of the pension.

**26.** 221 P.3d at 1011; *see also* TURNER, note 24, above, at 27–29.

**27.** *Tobey v. Superior Court,* 680 P.2d 782, 784 (Alaska 1984) (citing *Davis v. Superior Court,* 580 P.2d 1176, 1178 n. 3 (Alaska 1978)).

**28.** *See id.* at 784 n. 1 (citing *Esch v. Superior Court,* 577 P.2d 1039, 1043 (Alaska 1978)) ("Failure to make a clear record of the authority the court relied upon in imposing sanctions, as well

as the reasons for such sanctions, may require reversal in a particular case.").

**29.** *See* Alaska R. Civ. P. 70 (providing that court may hold party in contempt "[i]f a judgment directs a party ... to perform any ... specific act and the party fails to comply within the time specified"), 90 (explaining contempt types and procedures); *see also* AS 09.50.010(5) (stating that "disobedience of a lawful judgment, order, or process of the court" constitutes contempt).

**30.** *Cont'l Ins. Cos. v. Bayless & Roberts, Inc.,* 548 P.2d 398, 408–09 (Alaska 1976).

**31.** *See Hartland v. Hartland,* 777 P.2d 636, 648 (Alaska 1989) (holding that under Civil Rule 70 court was authorized to hold husband in con-

civil, "because the sanction served a punitive, as opposed to a coercive, function."[32] Additionally any contempt was indirect, because the court did not witness Charles facilitating the removal of Jacqueline's name from the survivor benefits plan.[33] A court may not impose indirect criminal contempt sanctions without providing specific procedural safeguards.[34] Here the record does not establish that such safeguards were provided and therefore a sanction for indirect criminal contempt could not stand.

Alternatively Civil Rule 95 provides:

For any infraction of [the rules of civil procedure], the court, after providing reasonable notice and an opportunity to be heard, may withhold or assess costs or attorney's fees as the circumstances of the case and discouragement of like conduct in the future may require; and such costs and attorney's fees may be imposed upon offending attorneys or parties.[35]

But in its order the superior court neither identified a civil rule that Charles violated nor characterized the sanction as an award of costs or attorney's fees.[36] Therefore Civil Rule 95 does not seem to be an appropriate basis for the sanction.

The superior court may take this matter up on remand, but we note that Jacqueline does not appear to have incurred monetary damages from the temporary extinguishment of the survivor benefits option aside from the costs associated with filing motions and contacting DFAS.[37]

### E. The Superior Court Did Not Err by Awarding Attorney's Fees To Jacqueline.

The superior court awarded Jacqueline $15,000 in attorney's fees, determining "that [Charles's] post appeal behavior has been similar to his prior conduct, and was unreasonable, vexatious, unfair and without basis in fact, law or equity." The superior court apparently made this award under the divorce exception to Civil Rule 82.[38] Charles argues the court abused its discretion because the evidence does not support the court's finding that his conduct (1) prevented

---

tempt for failure to comply with court order to transfer stock).

32. *Anchorage Police & Fire Ret. Sys. v. Gallion*, 65 P.3d 876, 880 (Alaska 2003) (citing *Johansen v. State*, 491 P.2d 759, 763 (Alaska 1971)).

33. *See id.* at 880 (citing *Hutchison v. State*, 27 P.3d 774, 779 (Alaska App.2001)) (noting that "contempt was indirect because the court did not witness or hear the conduct constituting the contempt"); *see also* Alaska R. Civ. P. 90(a)-(b) (distinguishing direct from indirect contempt).

34. *See* Alaska R. Civ. P. 90(b) ("[U]pon a proper showing on ex parte motion supported by affidavits, the court shall either order the accused party to show cause at some reasonable time, to be therein specified, why the accused party should not be punished for the alleged contempt, or shall issue a bench warrant for the arrest of such party."); *Cont'l Ins. Cos.*, 548 P.2d at 402 ("Thus it may not be necessary to furnish any notice for a direct contempt committed in the presence of the court, but a notice and hearing is required for indirect contempts.") (footnote omitted).

35. Alaska R. Civ. P. 95(a).

36. *Cf. In re Schmidt*, 114 P.3d 816, 826 (Alaska 2005) ("[W]hen assessing attorney's fees under Rule 95(a) ... the preferred practice is to cite a specific rule that has been violated.").

37. During the period when the survivor benefits option was not in place, Charles's disposable retirement pay was higher, and Jacqueline's 50% share was therefore higher, because no deduction was made for the cost of the survivor benefits option. When the survivor benefits option was reinstated, the cost became a deduction from gross retirement pay, thereby allocating the cost equally between Charles and Jacqueline in the equal division of Charles's disposable retirement pay.

38. *See* AS 25.24.140(a)(1) (providing that spouse may be awarded "attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action"). In her motion for attorney's fees Jacqueline relied on a divorce exception case, *Kowalski v. Kowalski*, 806 P.2d 1368 (Alaska 1991). The superior court signed Jacqueline's proposed order, which made no mention of the Rule 82 "prevailing party" standard.

We have previously explained that "the divorce exception to Rule 82 is inapplicable to postjudgment modification and enforcement motions." *Hopper v. Hopper*, 171 P.3d 124, 133 (Alaska 2007) (citing *McGee v. McGee*, 974 P.2d 983, 992 (Alaska 1999)). But neither Charles nor Jacqueline argues it was error for the superior court to award attorney's fees under the divorce exception to Civil Rule 82 instead of Civil Rule 82 itself. We therefore follow the parties' and the superior court's convention and analyze the award under the divorce exception.

the parties from litigating on an equal economic plane or (2) amounted to bad faith or vexatious litigation. We disagree.

 Although a court has broad discretion to award attorney's fees in divorce cases,[39] the primary purpose of such an award should be to allow the parties to litigate on an even plane.[40] A court may increase an award for bad faith or vexatious conduct,[41] but the court cannot disregard the parties' relative economic situations simply because one of the parties engaged in misconduct.[42] As we stated in *Kowalski v. Kowalski*, the court must follow a two-step process when increasing a fee award: "the court must first determine what fee award would be appropriate under the general rule, and only then increase the award to account for a party's misconduct." [43]

In its December 2, 2007, order, the superior court recognized that the "purpose of awarding attorney's fees in divorce cases is to allow the parties to litigate on an equal plane, and [that] awards are accordingly based on the parties' relative economic circumstances." The superior court also correctly noted that "[w]hen making an increased fee award, the court must first determine what fee award would be appropriate under the general rule, and only then increase the award to account for a party's misconduct." Finally, the court acknowledged that when "one spouse's misconduct has unnecessarily increased the other spouse's costs, the court must identify the nature and amount of these increased costs." The court then proceeded to apply this legal framework to the facts before it, pointing out that the parties' earlier settlement agreement, while equally dividing the parties' substantial assets, had still provided for payment of $2,000 of Jacqueline's attorney's fees. The court construed this fee award provision of the agreement to be "an implicit, if not explicit recognition that the parties' economic circumstances were not equal, that is to say, the parties were not on an economic equal plane." And the court determined that "in the absence of [Charles's] unreasonable and vexatious litigation misconduct, the court would find that a 25% award of [Jacqueline's] reasonable and necessary post-settlement litigation fees would be appropriate."

Although the superior court did not repeat these findings in its July 11, 2009, order for attorney's fees for post-appeal litigation, it did note that it was fully aware of the "multiple post appeal (first appeal) litigation" and then discussed the specific ways in which Charles had "unnecessarily dr[iven] up [Jacqueline's] attorney fees." Charles now claims that "[Jacqueline] is very capable of paying her own attorney fees" because: "[s]he has not paid the mortgage; she has not paid half the bills; she lives with her boyfriend ...; and she has taken thousands of dollars from [Charles]." But Charles provides no evidence for these allegations. And more importantly, even if these allegations were true they do not sufficiently demonstrate that the parties are economic equals.[44]

 We are unable to conclude that it was an abuse of discretion for the superior court to award Jacqueline attorney's fees. We first note that Charles waived any objection to the court's use of the Rule 82 divorce exception because he did not challenge it in his opening brief.[45] The court complied with

39. *Kowalski*, 806 P.2d at 1372 (citing *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987)).

40. *Broadribb v. Broadribb*, 956 P.2d 1222, 1229 (Alaska 1998) (quoting *Beard v. Beard*, 947 P.2d 831, 833 (Alaska 1997)).

41. *Kowalski*, 806 P.2d at 1373 (citations omitted). The court's findings of misconduct must be made expressly and explained clearly. *Id.*

42. *Id.*

43. *Id.*

44. *See, e.g., Fernau v. Rowdon*, 42 P.3d 1047, 1060 (Alaska 2002) (analyzing parties' relative economic situations in light of their job prospects and earning capabilities); *Doyle v. Doyle*, 815 P.2d 366, 373 (Alaska 1991) (focusing on parties' incomes in determining relative economic situations); *Johnson v. Johnson*, 564 P.2d 71, 77 (Alaska 1977) (identifying "the division of property and possibly the expenditure of fees" as relevant considerations).

45. *See Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010) (citing *Shearer v. Mundt*, 36 P.3d 1196, 1199 (Alaska 2001)) ("[I]ssues not argued in opening appellate briefs are waived."). We

the required two-step process—the court appears to have treated Jacqueline's motion for attorney's fees as a continuation of her initial effort to enforce the judgment and to have implicitly found there was no need to reassess fees due under the general rule because it calculated those fees in 2007.[46] We therefore view the court's award of an additional $15,000 in attorney's fees solely as a sanction for Charles's continued vexatious conduct. The court made three specific findings concerning Charles's misconduct: (1) Charles's delay in paying Jacqueline for her share of the house's equity unnecessarily increased her attorney's fees; (2) Charles "unreasonably opposed [Jacqueline]'s request for an order establishing her portion of the military [pension order], which again, escalated [Jacqueline]'s fees and costs"; and (3) Charles needlessly increased Jacqueline's fees and costs by filing baseless motions for attorney's fees and sanctions. The record amply supports each of these reasons. Charles's actions cannot simply be characterized as "byproducts of the adversarial system itself." [47]

We therefore conclude the superior court did not abuse its discretion by awarding Jacqueline attorney's fees.

## V. CONCLUSION

We VACATE the superior court's amended divorce decree and the order sanctioning Charles, AFFIRM the court's remaining orders, and REMAND for proceedings consistent with this opinion.

CARPENETI, Chief Justice, and STOWERS, Justice, not participating.

---

further note both parties waived any objection to applying the Rule 82 divorce exception in the initial appeal.

**46.** See Rodvik v. Rodvik, 151 P.3d 338, 352 (Alaska 2006) (holding that court did not abuse its discretion by awarding attorney's fees despite not making express finding about parties' relative economic situations, "because implicit within the trial court's findings was a threshold determination of relative equality of the parties' income").

**47.** Cf. Kowalski, 806 P.2d at 1373.